COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Chief Judge Decker, Judges Humphreys, Beales, Huff, O'Brien, AtLee, Malveaux,
           Athey, Fulton, Ortiz, Causey, Friedman, Chaney, Raphael, Lorish, Callins and White
Argued at Richmond, Virginia


ARUN RASHID TURAY

                                                      OPINION BY
v.      Record No. 0868-21-3                    JUDGE LISA M. LORISH
                                                   DECEMBER 19, 2023
COMMONWEALTH OF VIRGINIA


UPON A REHEARING EN BANC

FROM THE CIRCUIT COURT OF THE CITY OF WAYNESBORO
Paul A. Dryer, Judge

    Jessica N. Sherman-Stoltz (Sherman-Stoltz Law Group, PLLC, on
    briefs), for appellant.

    Liam A. Curry, Assistant Attorney General (Jason S. Miyares,
    Attorney General, on brief), for appellee.


        After receiving a report of a recent home invasion, Deputy C. Stroop stopped at that

home and spoke to another law enforcement officer about the reported crime.  He learned that

the suspects left on foot after pistol-whipping residents of the home.  It was almost midnight, on

a cold winter night, and he began driving around the residential neighborhood.  He heard a "be

on the lookout" (BOLO) dispatch describing the suspects as "three Black males wearing black."

Deputy Stroop soon came across two Black men walking in the road, one wearing a black jacket

and black pants.  He detained both men for one and a half to two minutes until other law

enforcement officers could arrive with additional information learned from watching home

security footage.  Applying binding precedent here, we make no new law in rejecting Turay's

argument that he was detained for these minutes without reasonable suspicion.

BACKGROUND[1]

After receiving a report of a potential home burglary at 11:00 p.m. in February 2020, the Waynesboro Police Department put out a police dispatch for officers to investigate the call. While en route to the home, Waynesboro Police Sergeant B.W. Lemons received another report that a shot had been fired at the same location. Sergeant Lemons was the first officer on the scene. When he went inside, two residents of the home reported that three Black males wearing black had come in the home and "pistol-whipped" them, causing obvious injuries. Other Waynesboro officers then arrived at the scene to assist in the investigation. Deputy Stroop, an Augusta County Sheriff's Deputy, was on patrol that same night and heard the call about the home invasion. He was "close to Waynesboro,"[2] so he drove past the crime scene and "talked to one of the Officers that was out there." Deputy Stroop learned that there had been a break-in, that a firearm was allegedly taken from the home,[3] and that the intruders fled on foot. Deputy Stroop left the scene at that point and began to drive around the area to see if he could find the individuals involved in the crime.

Deputy Stroop heard a BOLO radio transmission[4] from Sergeant Lemons advising all responding officers to look for "three Black males wearing black." Sergeant Lemons based this first BOLO on the information he learned from the residents. While driving around, Deputy Stroop saw two people walking down the road that he thought "matched the description of what was given out."

---

[1] "In reviewing the denial of a motion to suppress, we 'consider the facts in the light most favorable to the Commonwealth, the prevailing party'" below. *Hairston v. Commonwealth*, 67 Va. App. 552, 560 (2017) (quoting *Malborough v. Commonwealth*, 275 Va. 163, 168 (2008)).

[2] The City of Waynesboro is an independent jurisdiction roughly in the middle of Augusta County.

[3] The homeowner's missing firearm was later recovered in the bedroom, where one of the residents had moved it while waiting for officers to arrive.

[4] A year later, at the motion to suppress hearing, Deputy Stroop testified that he could not then recall from memory what the BOLO description said.

Deputy Stroop testified that he remembered saying to himself, "Hey; that matches the description that I heard over the radio." One man (Turay) was wearing a black jacket[5] with a red stripe down each arm and black pants. The other man (Justice Ahmed Carr[6]) was wearing gray pants and a white hoodie. Both had backpacks.

At the motion to suppress hearing, a year later, Deputy Stroop did not "remember what road it was," as he was "not familiar with Waynesboro," but that it was "off of [Route] 250." Based on the testimony of other officers, the trial court found the exact location was an estimated six to ten blocks from the crime scene where Deputy Stroop had just been. Because the body camera video showed Sergeant Lemons leaving the crime scene and reaching the block where Turay and Carr were detained in less than a minute's drive, the trial court concluded that the men had been stopped "a distance less than 10 blocks and likely less than [6] blocks."

When Deputy Stroop saw Turay and Carr, they were walking down the road in a residential neighborhood on a cold winter night, near midnight. Deputy Stroop saw no other people walking in the neighborhood that night, let alone anyone else that matched the BOLO.[7] About 30 minutes after

---

[5] The trial court found Sergeant Lemons described the item Turay was wearing as a "black sweatshirt with a red stripe." Sergeant Lemons alternated between describing the item as a black sweatshirt and a black jacket. Officer Mawyer testified at the suppression hearing that he remembered Turay was wearing a "black jacket with a distinct red stripe . . . down the sleeves."

[6] In a separate appeal, Carr challenged his detention and this Court reversed the trial court in an unpublished opinion. *Carr v. Commonwealth*, No. 1136-21-3, 2022 WL 10219762 (Va. Ct. App. Oct. 18, 2022), *petition for appeal refused*, *Commonwealth v. Carr*, No. 220750 (Va. Feb. 22, 2023).

[7] In addition to this testimony from Deputy Stroop, the trial court viewed the body camera footage of the journey from the crime scene and the place Turay was detained in which no other people could be seen walking around the neighborhood.

the reported home invasion, Deputy Stroop detained the two men at gunpoint.[8]  Nothing else about the behavior of the two men stood out to Deputy Stroop.  He testified that he wanted to detain the men until the Waynesboro officers, who had more information, could arrive.  Both men complied with all of Stroop's requests, including putting their hands on the hood of his car until those other officers arrived, merely a minute and a half or two minutes later—"in the blink of an eye."

At some point while Stroop was detaining the two men, or waiting for the other officers to arrive, Sergeant Lemons sent another dispatch with more information about the suspects based on his review of the security video footage.  Because the trial court concluded Deputy Stroop did not hear the other BOLOs before deciding to detain Turay, we do not elaborate on what those BOLOs said.  We note only that within minutes of Deputy Stroop's detaining the men, other officers with additional information did arrive, including Sergeant Lemons, who had personally watched the security video footage.  Sergeant Lemons confirmed that Turay was wearing clothing that matched the security video footage, but said that Carr was not dressed the same.  After Carr consented to a search, credit cards belonging to one of the victims from the home were found in his pocket.  Both men were then arrested, and additional searches took place, producing incriminating evidence that Turay asked the trial court to suppress.

At the suppression hearing, the trial court found Deputy Stroop had reasonable, articulable suspicion to stop and detain Turay given the "totality of the circumstances on the night in question." Stressing "[t]he confluence of multiple factors of proximity, time, physical description, gender, and racial description[,]" the court denied Turay's motion to suppress.  After this, Turay entered a conditional guilty plea to armed burglary with the intent to commit robbery, robbery, use of a

---

[8] Stroop explained that he detained them at gunpoint "due to the firearm that was involved in the incident" and "for my safety" because he was by himself.  *See Harris v. Commonwealth*, 27 Va. App. 554, 563 (1998) ("During *Terry* [*v. Ohio*, 392 U.S. 1 (1968,] stops, the police are permitted to use methods of restraint that are reasonable under the circumstances.").

firearm in the commission of a felony, and being a felon in possession of a firearm. Turay appealed, and a divided panel of this Court reversed. *See* No. 0868-21-3, 2023 WL 2575693 (Va. Ct. App. Mar. 21, 2023). We then granted the Commonwealth's request for review en banc.

ANALYSIS

Turay contends that the trial court erred in denying his motion to suppress because his "Fourth and Fourteenth Amendment Rights were violated when law enforcement, having no reasonable articulable suspicion of criminal activity, stopped and seized him." He argues that the description of the suspects in the first BOLO was so general and vague that Deputy Stroop impermissibly detained him based on hunch alone. Turay's challenge is specifically limited to whether Stroop had reasonable suspicion to detain him for one and a half to two minutes until Waynesboro police officers arrived with additional information. Turay does not challenge his arrest or the ultimate search of his person and backpack. Thus, we review only whether reasonable suspicion supported his minutes-long detention until other officers arrived where he was detained.

A Fourth Amendment challenge like this one presents a mixed question of law and fact that we review de novo on appeal. *Murphy v. Commonwealth*, 264 Va. 568, 573 (2002). In conducting our review, "we defer to the trial court's findings of 'historical fact'" unless such findings are "plainly wrong or devoid of supporting evidence." *Barkley v. Commonwealth*, 39 Va. App. 682, 690 (2003) (quoting *Davis v. Commonwealth*, 37 Va. App. 421, 429 (2002)). In doing so, we are required to "give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." *McGee v. Commonwealth*, 25 Va. App. 193, 198 (1997) (en banc).

Our dissenting colleagues conclude that two factual findings of the trial court were "plainly wrong." First, they find the initial BOLO specified that the three Black men were "wearing black sweatshirts" and not simply "wearing black." As we explain below, even if true, this distinction would not change the analysis. Second, our colleagues find error in the trial court's

- 5 -

conclusion that Deputy Stroop did not see anyone else in the neighborhood that night, because Deputy Stroop's testimony was that there were "not a lot" of people out that night. After the trial court issued a written opinion with its conclusions of fact, Turay filed no objection or challenge to this factual finding. What is more, Turay conceded in his briefing before the panel of this Court that "Turay and his codefendant were the only two people seen in the vicinity of where Deputy Stroop was driving around." Concessions of fact, "including concessions made for the first time on appeal," are binding. *Mintbrook Devs., LLC v. Groundscapes, LLC*, 76 Va. App. 279, 293 (2022) (citing *Logan v. Commonwealth*, 47 Va. App. 168, 170, 172 (2005) (en banc)).[9]

We now evaluate how the trial court applied its factual findings to the law.

I. Brief investigatory stops based on reasonable suspicion do not violate the United States Constitution's Fourth Amendment.

Turay challenges his seizure, relying on the Fourth Amendment of the United States Constitution: "The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated[.]"[10] The United States Supreme Court has held that "a police officer may, without violating the Fourth Amendment, make a brief investigatory stop of a person when the officer has a reasonable suspicion, based on objective facts, that criminal activity may be afoot." *Mason v. Commonwealth*, 291 Va. 362, 367 (2016) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Whereas full-scale arrests must be based on probable cause, these "brief investigatory stops," now known as *Terry* stops, "must be based on specific and articulable facts

---

[9] Turay likewise conceded in his briefing that the stop occurred "approximately 30 minutes" later.

[10] In relying on the Fourth Amendment, Turay does not assert any claim that Virginia law provides him different or broader rights.

which, taken together with rational inferences from these facts, reasonably warrant a limited intrusion." *Iglesias v. Commonwealth*, 7 Va. App. 93, 99 (1988).[11]

To have reasonable suspicion, a police officer need only have a "'minimal level of objective justification' for making . . . a stop." *Branham v. Commonwealth*, 283 Va. 273, 280 (2012) (quoting *I.N.S. v. Delgado*, 466 U.S. 210, 217 (1984)). The reasonable suspicion must be "particularized" to the person or persons stopped. *Whitfield v. Commonwealth*, 265 Va. 358, 361 (2003). That said, reasonable suspicion "need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002). To the contrary, "the principal function of [the] investigation is to resolve that very ambiguity . . . to 'enable the police to quickly determine whether they should allow the suspect to go about his business or hold him to answer charges.'" *Morris v. City of Va. Beach*, 58 Va. App. 173, 183 (2011) (quoting *Raab v. Commonwealth*, 50 Va. App. 577, 582 (2007) (en banc)). In this way, reasonable suspicion is "not an exacting" standard. *Hill v. Commonwealth*, 297 Va. 804, 815 (2019) (quoting *Braun v. Maynard*, 652 F.3d 557, 561 (4th Cir. 2011)). The "'mere "possibility of an innocent explanation"' does not necessarily exclude a reasonable suspicion that criminal activity is afoot." *Id.* (quoting *Shifflett v. Commonwealth*, 58 Va. App. 732, 736 (2011)). Our Supreme Court has emphasized that phrases like "may have been" and "could have been" "reflect the [doctrine's] appropriate probabilistic formulation." *Id.*

In determining whether a police officer had the "minimal level of objective justification" to justify such a stop, we consider "the totality of the circumstances," *Bland v. Commonwealth*, 66 Va. App. 405, 413-14 (2016), and "we eschew any 'divide-and-conquer analysis' that ignores the 'totality of the circumstances,'" *Shifflett*, 58 Va. App. at 740 (quoting *Arvizu*, 534 U.S. at 274). *See also United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008) ("It is the entire

---

[11] We do not address the "*Terry* frisk" doctrine arising from the same case.

mosaic that counts, not single tiles." (quoting *United States v. Whitehead*, 849 F.2d 849, 858 (4th Cir. 1988))). We are expressly forbidden to view any fact "in isolation, rather than as a factor in the totality of the circumstances." *Dist. of Columbia v. Wesby*, 583 U.S. 48, 60 (2018) (quoting *Maryland v. Pringle*, 540 U.S. 366, 372 n.2 (2003)). Our analysis is always limited to the "facts available to the officer at the moment of the seizure," *Terry*, 392 U.S. at 21-22, and does not consider information learned *after* the person was detained.

    II. Where an officer briefly detains a suspect in response to the report of nearby criminal activity, the traditional *Terry* factors are assessed in light of the reported crime.

Following *Terry*, an officer may briefly, and lawfully, detain a suspect for investigation in various scenarios. The "most common type of stopping-for-investigation situation" is when "the stop[s] occur as a part of general police patrol activity" and are "directed, in the main, to crime prevention and to the termination of criminal activity in its early stages." 4 Wayne R. LaFave, *Search and Seizure* § 9.5(h) (6th ed. 2020). In that case, there "are ordinarily no doubts as to whether police have the right person," and instead, "the central issue is whether the circumstances make sufficiently likely the possibility that this person has just committed, is committing, or is about to commit a criminal offense." *Id.* The factors relevant to reasonable suspicion for such a detention usually "include characteristics of the area surrounding the stop, the time of the stop, the specific conduct of the suspect individual, the character of the offense under suspicion, and the unique perspective of a police officer trained and experienced in the detection of crime." *McCain v. Commonwealth*, 275 Va. 546, 554 (2008).

In this typical detention scenario—where the police detain someone as part of general police patrol activity—our Supreme Court has cautioned that "location" and the "time of the stop," on their own, cannot provide reasonable suspicion of criminal activity. *Id*. at 552, 554. While "[t]he character of the location and the time at which a person is observed are relevant factors," without more, "they do not supply a particularized and objective basis for suspecting

- 8 -

criminal activity on the part of the particular person stopped." *Id.* at 552; *see also Hall v. Commonwealth*, 22 Va. App. 226, 228 (1996) (concluding that "travelling in or near a neighborhood frequented by individuals who use illegal drugs is not a basis for concluding that [defendant] was engaged in criminal conduct or dangerous"). For this reason, a defendant's brief presence in the "early morning hours" at a home associated with drug activity did not give an officer reasonable suspicion that the defendant had committed or was about to commit a crime. *McCain*, 275 Va. at 550. An officer's mere "hunch" that a defendant is "involved with drugs because of the neighborhood and the house . . . does not rise to the level of reasonable suspicion." *Id.* at 554-55. In *McCain*, the Court emphasized that there were no other factors present to enhance the relevance of time and location alone: "[t]he officers' interaction with McCain during the traffic stop in no way supported this hunch, because the officers did not observe or notice any drugs, odor of drugs, or drug paraphernalia in the vehicle," or "any physical or mental impairment that would indicate drug use." *Id.* at 555.

This common detention fact-pattern described above is not why Turay was detained here. Instead, Turay was detained in response to a report of specific and recent criminal activity in a particular place. In that context, an officer encounters a suspect not in the vacuum of routine patrol activity, but against the backdrop of that recently reported crime. Thus, a reviewing court must consider the general reasonable suspicion factors discussed above in relation to the reported crime.

For example, geographic and temporal proximity to the reported criminal activity is vital. The shorter the distance and closer the timing to a specific reported crime, the greater the value of proximity to the reasonable suspicion calculus. *See, e.g.*, *Jones v. Commonwealth*, 230 Va. 14, 18 (1985) (noting the stop happened in the "area" of recent burglaries including one that happened only "a day or two" before the detention); *United States v. Moore*, 817 F.2d 1105,

1107 (4th Cir. 1987) (affirming reasonable suspicion where suspect was "close" to a building "two or three minutes" after the building's silent burglar alarm was triggered). To this end, any information about the suspect's method of transportation is also relevant in defining the places a reasonable officer might expect to encounter the suspect, although this factor, like the others, is not determinative on its own. *Cf. Davis v. Commonwealth*, 35 Va. App. 533 (2001) (upholding detention of vehicle where suspect described as fleeing on foot).

The level of detail in any available description of the suspect, and the degree to which the detained person matches that description, are also important. *Brown v. Commonwealth*, 33 Va. App. 296, 307 (2000) ("If a person matches the physical description of a criminal suspect, the police have reasonable suspicion to effect a *Terry* stop of that individual."). Consistent with the "totality of the circumstances" approach, and the inexact nature of the reasonable suspicion analysis, an exact match is not required. 4 LaFave, *supra*, § 9.5(h) (discussing that an "account must be taken of the possibility that by a change of circumstances or efforts at concealment some aspects of the description may no longer be applicable"). The level of detail provided in the description, like the degree to which a subject matches the description, operate on a sliding scale of relevance. *Id.* "[T]he value of a vague or general description in the reasonable suspicion analysis may be enhanced if other factors known to the police make it reasonable to surmise that the suspect was involved in the crime under investigation." *Commonwealth v. Robinson-Van Rader*, 208 N.E.3d 693, 701 (Mass. 2023) (alteration in original) (quoting *Commonwealth v. Meneus*, 66 N.E.3d 1019, 1025 (Mass. 2017)).

Finally, the number of persons out and about in the area of investigation who match the description of the suspect, as well as the observed behavior of the suspect, are also relevant considerations. *Moore*, 817 F.2d at 1107 (finding relevant that "[t]he call came late at night, and [that] appellant was the only person in the vicinity"); *United States v. Gutierrez*, 963 F.3d 320,

335 (4th Cir. 2020) (finding reasonable suspicion to stop a vehicle "driving away from the neighborhood where the robbery occurred" about "twenty minutes" after a suspect "fled on foot" when the "car was the only car on the road"). As these are the factors present discussed by the parties and court below, we make no effort to catalogue every other factor that could be hypothetically relevant in future cases.[12]

Before evaluating these factors here, we emphasize one final consideration relevant to every *Terry* stop. We have repeatedly affirmed that "[i]n conducting a *Terry* stop, the police must diligently pursue a means of investigation likely to confirm or dispel their suspicions quickly." *Brown*, 33 Va. App. at 307. Once an officer detains a suspect, the "[a]uthority for the seizure . . . ends when tasks tied to the [basis for the stop] are—or reasonably should have been—completed." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). In essence, the intrusion of liberty must be consistently calibrated against the grounds for suspicion.

III. Deferring to the trial court's factual findings, we cannot say Deputy Stroop lacked reasonable suspicion under the totality of the circumstances.

Having established factors relevant to evaluating the detention of a suspect near the location of recent criminal activity, we now look at each factor in turn. In doing so, we are limited to reviewing Deputy Stroop's initial detention of Turay for mere "minutes" before other officers arrived with additional information confirming that Turay matched the person Sergeant Lemons saw in the security video footage. We must consider whether Deputy Stroop's detention of Turay for this brief period until he could get more information from nearby officers was supported by reasonable suspicion.

---

[12] Professor LaFave discusses six broad categories of information that courts typically consider in determining whether a detention following a recent report of a crime was supported by reasonable suspicion. 4 LaFave, s*upra*, § 9.5(h).

Starting with the physical description of the suspects, the trial judge found that Deputy Stroop heard only the first BOLO before he detained Turay. That description was broad and general: three Black men wearing black, or black sweatshirts. This description, standing alone, was too general to give rise to reasonable suspicion to detain any person. Without more, this vague description could not allow police to reasonably detain any Black male wearing dark clothing as a suspect in the crime. But this does not end the analysis because, as discussed above, the value of a general description may be enhanced by other factors.

The relevant factors here include where, and when, Deputy Stroop detained Turay. After leaving the crime scene, Deputy Stroop drove only a few blocks before he saw Turay (matching the general BOLO)[13] and another man walking in the street. That the men were *walking* matches the method of transportation described by the witnesses. That they were walking also makes the location more relevant—it was plausible and reasonable to think suspects leaving on foot could still be in the neighborhood 6-10 blocks away only 30 minutes after the home invasion took place. What is more, the men were walking down the road in a residential neighborhood, late at night (nearly midnight). During this time, Deputy Stroop had not seen any other people out and about, nor would he expect to, given the late hour, the residential nature of the neighborhood, and the fact that it was cold. Because he saw no one else at all, he certainly did not see anyone else matching the general BOLO. These factors all increase the relevance of Turay matching what would otherwise be a vague or general description.

The fact-specific nature of each determination in a reasonable suspicion calculus makes it difficult to compare cases and find an apples-to-apples match. But here, the mosaic of factors furnishing reasonable suspicion for Deputy Stroop to detain Turay resembles the composition of

---

[13] Even if the first BOLO specified "black sweatshirts," Turay matched that description by wearing what officers described to be a black jacket or sweatshirt.

factors present in *Davis*, where an officer received a report about a fight in a subdivision but no physical description of any suspect. 35 Va. App. at 536. A second radio dispatch informed the officer that the suspect left on foot, fleeing towards Pinewood Drive, another street within the same subdivision. *Id.* When the officer arrived on Pinewood Drive, in the early morning hours, he "saw a vehicle rapidly backing out of a driveway" and stopped that vehicle to determine whether the driver was the suspect earlier seen running in that general direction. *Id.* While the reported crime did not take place on "the same street or address where he later encountered" the suspect, it was in the same subdivision. *Id.* While not stated directly, implicit in our Court's observation that the crime occurred "in the early morning hours," in a residential subdivision, is that few other individuals were out and about. *Id.* at 540. At the same time, the officer had no physical description of the suspect and encountered Davis in a car, not on foot. *Id.* at 536. Yet we held that the combination of geographic and temporal proximity to the reported fight, the early morning hour, and the fact the vehicle was being "rapidly backed out of a driveway," was sufficient reasonable suspicion for a brief detention to allow the officer to confirm or dispel the suspicion. *Id.* at 540.

This case also resembles *Jones*, in which the Supreme Court affirmed the finding of reasonable suspicion where a suspect was detained several days after reports of recent burglaries in an urban area. 230 Va. at 16. Officers were advised to be on the lookout for a Black male suspect in his twenties, about 5'10," 175 pounds "with a husky build, dark complexion, and in one incident [was] wearing shorts and a T-shirt [and in] another . . . was . . . wearing a jogging suit [and] carrying a large knapsack like bag, possibly a duffel bag." *Id.* (alterations in original). While this description contained some more physical characteristics of the suspect than the one given here, the sum was general enough to broadly apply to a wide number of people in a city, particularly considering the varying description of the suspect's clothing. *Id.* Several days after

- 13 -

the most recent burglary, an officer detained Jones "some 300 yards" (the length of three football fields and several city blocks) from the scene of one of the burglaries. *Id.* The officer saw him leave a hotel in Arlington at 8:00 p.m., while wearing a jogging suit, carrying two duffel bags, and otherwise matching the general physical description provided. *Id.* These facts, plus the officer's assessment that Jones appeared to be looking for "something or someone," were enough for our Supreme Court to affirm his detention based on the low standard for reasonable suspicion. *Id.* This is true even though the same factors would have justified the detention of a large number of young Black men of average height and weight leaving a hotel with luggage and looking for a cab or friend. And, unlike this case, we note that the officer there immediately patted Jones down instead of briefly detaining him while waiting for additional information.

Given the prior holdings in *Jones* and *Davis*, and after considering the totality of the circumstances here, we affirm the trial court's holding that Deputy Stroop possessed a reasonable, articulable suspicion of criminal activity to briefly detain Turay until the other officers arrived—within minutes—with additional corroborating information. In reaching this conclusion, we do not hold that Stroop would have been justified in searching Turay, or in detaining him for longer than a few minutes, as we are not presented with those questions here.[14]

---

[14] The out-of-jurisdiction cases cited by our dissenting colleagues support the conclusion that a generalized BOLO is insufficient for reasonable suspicion *absent additional supporting circumstances*. For example, in *M.M. v. State*, 80 So. 3d 1125, 1126 (Fla. Dist. Ct. App. 2012), the court explained that the generalized BOLO (containing only the race and gender of the suspects) was not enough because the officer detained the individuals at a time when "there were other people outside on the street." What is more (and unlike in this case) the officer did not wait for additional information to arrive but proceeded to immediately frisk the suspects. *Id.* The D.C. Court of Appeals likewise emphasized that a generalized BOLO is not sufficient for particularized reasonable suspicion especially when "there are other persons in the vicinity," observing that "[w]e have been unable to find a case where reasonable particularized suspicion was found to exist based on a generalized lookout at a time of day when a large number of cars and/or people are likely to be present . . . ." *Armstrong v. United States*, 164 A.3d 102, 113 (D.C. 2017). While *Commonwealth v. Warren*, 58 N.E.3d 333 (Mass. 2016), has some similarities to this case, a more recent decision cited above, *Robinson-Van Rader*, 208 N.E.3d

Turay argues that several factors defeat reasonable suspicion here.  First, he argues that he did not match the generalized description of the suspects because he was with one other man, not two, and because the other man (Carr) was not wearing black.  As discussed above, the description here of "three Black males wearing black" was, on its own, too vague to provide particularized reasonable suspicion that Turay was involved with the reported crime.  That generalized description only became somewhat probative when combined with the geographic and temporal proximity of the detention and the fact that no one else meeting that description was observed in the same area.  Given the entire picture here, we cannot isolate the fact that Turay was walking with only one other person, not two, or the fact that his companion was not wearing black.  These factual differences are not enough, as a matter of law, to defeat reasonable suspicion.[15]

Turay also argues that neither he, nor his companion, did anything "suspicious" when Stroop saw them walking up the street.  Without the presence of suspicious activity, Turay argues, Stroop could not have formed the particularized suspicion that is required to detain him lawfully.  After receiving a description of suspects involved in criminal activity, an officer's personal observations about the suspects are plainly relevant to the reasonable suspicion calculus.  But there has never been a requirement that suspects to a recent crime "act suspicious"

693, distinguished and limited *Warren* when it concluded that officers had reasonable suspicion to detain two Black men on foot a mile from the reported crime and following a generalized BOLO that described two Black men on bicycles wearing hoodies.  In *Robinson-Van Rader*, the court affirmed (as we do here) that a generic description "standing alone, [i]s insufficient to provide reasonable suspicion" but that "additional factors [may] narrow[] the search for suspects" such that officers do have reasonable suspicion.  *Id.* at 704.

[15] As for Carr, who was not wearing anything black, we recognize that a divided panel of this Court, in an unpublished decision, reversed the trial court's finding that reasonable suspicion justified his detention, *Carr*, No. 1136-21-3, 2022 WL 10219762, and that our Supreme Court refused the Commonwealth's petition for appeal, *Carr*, No. 220750.  The question of whether the reasonable suspicion calculus as to Carr was sufficiently altered by Carr's clothing is not an issue before us today.

- 15 -

again during later encounters. Our Supreme Court rejected this same argument more than 40 years ago, in the immediate wake of *Terry*, and we remain bound by the same holding today. The specific factors giving rise to reasonable suspicion need not be observed directly by the officer but can come from descriptive "information furnished by another person." *Simmons v. Commonwealth*, 217 Va. 552, 555 (1977).[16] Said another way, the eyewitness report of the recent crime provided the account of suspicious activity here.

Accepting the trial court's factual findings, we cannot say that Turay's Fourth Amendment rights were violated when Stroop detained him for a few minutes while other officers, with more information about the suspects of the recent crime, were arriving to the scene. Thus, the trial court did not err in denying his motion to suppress.

CONCLUSION

For these reasons, we affirm the judgment of the trial court.

*Affirmed.*

---

[16] This case does not involve an anonymous tip, so we do not need to assess whether the information in the tip had "sufficient indicia of reliability." *See, e.g.*, *Jackson v. Commonwealth*, 267 Va. 666, 674-75 (2004) (citing *Alabama v. White*, 496 U.S. 325 (1972)).

Chaney, J., dissenting.

Today, while purporting to "make no new law," the majority grants police license to seize a Black man at gunpoint for merely walking late at night within the wide general area of a recent crime and "matching" the race and gender of the suspects.[17] The majority's en banc opinion authorizes such a warrantless seizure of Turay despite adopting the panel majority's prior holding that the BOLO's description of Black male suspects was too general to justify the seizure of any person. Because the majority's opinion disregards the well-established protections of the Fourth Amendment and, in effect, authorizes race-based seizures of persons who appear to be engaged in innocent, lawful activity, I must dissent.[18]

In addition to disagreeing with the majority's review of some of the circuit court's factual findings, this dissent concludes that the majority misapplies Fourth Amendment principles to the relevant facts. Even if the circuit court's and the majority's factual conclusions are assumed to be entirely correct, the officer's warrantless seizure of Turay was unconstitutional.

A.  Unconstitutional Seizure Based on a General BOLO

The police unconstitutionally seized Turay without reasonable, articulable suspicion that he was engaged in any criminal activity. The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. "If a police officer has reasonable, articulable suspicion that a person is engaging in, or is about to engage in, criminal activity, the officer may detain the suspect to conduct a brief investigation without violating the person's Fourth Amendment protection against unreasonable searches and

---

[17] Turay was six to ten blocks from the crime scene when the officer observed him merely walking down the street. R. 374.

[18] In determining whether the seizure of Turay was constitutional, this Court must consider only "the facts available to the officer at the moment of the seizure." *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968).

seizures." *Long v. Commonwealth*, 72 Va. App. 700, 712 (2021) (quoting *McGee v. Commonwealth*, 25 Va. App. 193, 202 (1997) (en banc)). "A reasonable, articulable suspicion is "'a *particularized* and *objective* basis" for suspecting the person stopped of criminal activity.'" *Id.* (emphases added) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

Deputy Stroop's seizure of Turay violated his Fourth Amendment right against unreasonable seizures because, at the time of the seizure, there was no particularized, objective basis for suspecting Turay of criminal activity. Deputy Stroop seized Turay and his companion, Justice Carr, after he heard Sergeant Lemons's radioed announcement to "be on the lookout" (BOLO) for "three Black males who were all armed" and "wearing black sweatshirts." Record ("R.") 344, 351, 357.[19] Deputy Stroop testified at the suppression hearing that he stopped Turay and Carr after he concluded "[t]hey matched the description" in the BOLO. R. 400. But neither Turay nor Carr was wearing a black sweatshirt when Deputy Stroop seized them at gunpoint. The police bodycam video shows Turay wearing a long-sleeved black top with a wide red stripe down each sleeve and a wide blue panel on each side. The police bodycam video shows Carr wearing a long-sleeved white top. Deputy Stroop did not testify that either Turay or Carr was wearing a black sweatshirt. A patrol officer who responded to the BOLO testified that Turay "was wearing a black jacket with a distinct red stripe . . . down the sleeves," R. 369, and Carr was wearing a white hoodie. According to Sergeant Lemons's police report and testimony, neither Turay's nor Carr's clothing matched the suspects' clothing description in the BOLO. Sergeant Lemons testified:

> Q: And then you arrived, and you immediately saw that they weren't wearing what was described, or what you knew personally from the - from the cell phone footage; right?
>
> A: Correct. . . . [T]he *clothing didn't match*; that's correct.

R. 354-55 (emphasis added).

_____

[19] For the sake of transparency in appellate review, citations to the record are intentionally included in this dissenting opinion.

- 18 -

Q: Do you recall, in your report, that . . . You indicated in your report that at the time of arrival that *the first thing you noticed was that neither of the males' clothing description matched what you had said over the radio*?

A: I do recall that; *yes*, ma'am.

R. 361 (emphases added).

In the circuit court's stated findings of fact, the court misstated the evidence by unreasonably abbreviating the BOLO's clothing description to merely "wearing black." This finding about the BOLO's contents is not entitled to deference on appellate review because it is contrary to the evidence. *See Spinner v. Commonwealth*, 297 Va. 384, 392 (2019) (noting that appellate courts "defer to the fact-finder's findings of historical fact unless they are plainly wrong or without evidence to support them"). The circuit court stated on the record that "the initial description, the one that Sergeant Lemons testified to, was that it was three Black males with three black - wearing black sweatshirts." R. 418. Although Sergeant Lemons—the officer who issued the BOLO—initially testified that the BOLO was for "three Black males who were all armed" and "wearing black," he subsequently acknowledged in his testimony that the BOLO's clothing description was "black sweatshirts." R. 344, 351. The BOLO's description "black sweatshirts" was confirmed in the testimony of Officer Mawyer, a patrol officer who responded to the BOLO. R. 379. Furthermore, the Commonwealth conceded at the suppression hearing that Sergeant Lemons's initial BOLO was for three "Black males wearing black sweatshirts." R. 414.

Only by abbreviating the BOLO's clothing description could the circuit court find that Turay's clothing matched the BOLO. Based on the actual BOLO for "three Black males who were all armed" and "wearing black sweatshirts," the fact that Turay's pants were black was irrelevant and Turay's clothing did not match the BOLO's clothing description.

In addition to the fact that neither Turay nor Carr wore clothing matching the BOLO's description, neither Turay nor Carr appeared armed, as the suspects were described in the BOLO.[20]

The record shows that Deputy Stroop's seizure of Turay and Carr was a race-based seizure of two Black male pedestrians who—at the time of the seizure—appeared to be engaged in innocent, lawful conduct. Since neither Turay nor Carr wore clothing matching the BOLO description and neither appeared to be armed, Turay and Carr only matched the BOLO description of "Black males."[21] Apart from this purported match with the BOLO description, Deputy Stroop observed nothing suspicious about Turay and Carr. Deputy Stroop testified that when he observed Turay and Carr, they were merely walking—not rushing—down the road in a residential neighborhood. R. 400-01. The majority correctly notes that the "'mere "possibility of an innocent explanation"' does not necessarily exclude a reasonable suspicion that criminal activity is afoot." *Hill v. Commonwealth*, 297 Va. 804, 815 (2019) (quoting *Shifflett v. Commonwealth*, 58 Va. App. 732, 736 (2011)) (holding that defendant's suspicious conduct gave officers reasonable suspicion that he was reaching for a gun, although it was possible the defendant had no weapon). But Turay's apparently innocent, lawful conduct of walking down the street required no explanation and did not give rise to a reasonable suspicion of criminal activity.

Whether the BOLO at issue here was for "three Black males wearing black" or "three Black males wearing black sweatshirts," an officer's observation of someone who fits either description does not give rise to reasonable suspicion of criminal activity. As the majority acknowledges, both descriptions are "too general to give rise to reasonable suspicion to detain any person." Matching the description "Black males wearing black" or "Black males wearing

---

[20] Both Turay and Carr later proved to be unarmed.

[21] Turay and Carr did not match the BOLO description of "*three* Black males." (Emphasis added).

black sweatshirts" is an insufficient basis for a finding of reasonable suspicion because nondescript black clothes or black sweatshirts are abundant and exceedingly common. "[A] vague description simply would not justify a law enforcement officer in stopping every individual who . . . might possibly meet that description." *M.M. v. State*, 80 So. 3d 1125, 1127 (Fla. Dist. Ct. App. 2012) (alterations in original) (quoting *State v. Hetland*, 366 So. 2d 831, 839 (Fla. Dist. Ct. App. 1979), *approved*, 387 So. 2d 963 (Fla. 1980)).[22] "In the absence of other circumstances that provide sufficient particularity, a generalized description applicable to large numbers of people contradicts the Fourth Amendment's jurisprudence demanding specificity and will not suffice to justify the seizure of any individual." *Armstrong v. United States*, 164 A.3d 102, 108 (D.C. 2017) (citations omitted) (holding that the lookout description of "a white car, possibly a Mercury Sable, with tinted windows and two [B]lack males" was insufficiently particularized for reasonable suspicion); s*ee also United States v. Brown*, 448 F.3d 239, 247 (3d Cir. 2006) (holding that the police radio broadcast of a description of two Black male robbery suspects "fail[ed] to satisfy the Fourth Amendment's 'demand for specificity'" (quoting *Terry v. Ohio*, 392 U.S. 1, 21 n.18 (1968))). Here, the BOLO description of three Black males wearing black or wearing black sweatshirts lacks the particularized specificity necessary to warrant the seizure of any person. *See Terry*, 392 U.S. at 21 n.18 ("This demand for specificity in the information upon which police action is predicated is the central teaching of [the United States Supreme] Court's Fourth Amendment jurisprudence.").

### B.  Application of Fourth Amendment Precedents

The caselaw relied on by the majority does not justify the seizure of Turay. The majority contends that the facts in this case are analogous to those in *Jones v. Commonwealth*, 230 Va. 14 (1985) (affirming circuit court's denial of suppression motion where police seized defendant who

---

[22] Cases from other jurisdictions are cited as persuasive, non-binding authority.

- 21 -

matched a BOLO's suspect description). But *Jones* is clearly distinguishable. The majority

ignores the crucial fact, noted by our Supreme Court in *Jones*, that the defendant's observed

"behavior . . . was sufficiently suspicious . . . to 'warrant a man of reasonable caution in the

belief' that 'criminal activity may be afoot.'" 230 Va. at 18 (quoting *Terry*, 392 U.S. at 22, 30).

In contrast, as the Commonwealth concedes, Turay's observed conduct—merely walking down

the street—was not suspicious and provided no basis for a reasonable suspicion that he may be

engaged in criminal activity. Additionally, in contrast with the general, vague BOLO at issue

here, the BOLO in *Jones* was descriptive beyond race and gender, describing the burglary

suspect as a Black male in his twenties, 5 feet, 10 inches tall, 175 pounds, "with a husky build,

dark complexion, and in one incident [was] wearing shorts and a T-shirt [and in] another . . .

was . . . wearing a jogging suit [and] carrying a large knapsack[-]like bag, possibly a duffel bag."

*Id.* at 16 (all but last alteration in original). The BOLO in *Jones* described the suspect by age,

height, weight, physical build, complexion, clothing, and luggage—in addition to race and

gender. The defendant in *Jones* was not only a Black male wearing a jogging suit and carrying

two duffel bags, he matched the BOLO's fairly detailed, particularized physical description *and*

he was acting suspiciously. In contrast, Turay's conduct was not suspicious, his clothing didn't

match the BOLO's description, and he was stopped based on a vague, general description that

included no particulars relating to his personal physical characteristics such as age, height,

weight, build, and complexion.

The majority also contends that the relevant facts in this appeal are analogous to the facts

that supplied reasonable suspicion for the seizure of the suspect in *Davis v. Commonwealth*, 35

Va. App. 533 (2001). I disagree. The police officer in *Davis*, informed that a suspect was

fleeing a crime scene in a particular direction, stopped a vehicle that appeared to be hurriedly

moving in the described area. While the officer was en route to the scene of a reported fight in

progress "in the Pinewood subdivision," he was notified that "the suspect was running toward Pinewood Drive." 35 Va. App. at 536. No description of the suspect was provided. When the officer "arrived at Pinewood Drive, which was in the same subdivision where the fight occurred, he saw a vehicle rapidly backing out of a driveway." *Id.* The officer then stopped the vehicle to determine whether the driver—the defendant, Davis—was the suspect who fled from the scene of the fight. This Court held that the officer lawfully seized Davis based on "a reasonable, articulable suspicion that a crime had been committed and that the person leaving the area in the vehicle was the suspect." *Id.* at 540.

The facts supporting a finding of reasonable suspicion in *Davis* are distinguishable from the facts here. In *Davis*, the street on which the officer found the defendant was within the same subdivision where the crime occurred and was the exact same street the suspect reportedly fled toward. *Id.* at 536. And the officer in *Davis* observed the defendant immediately after the suspect fled from the scene of the crime. *Id.* Additionally, this Court found that the officer in *Davis* observed the defendant engaged in conduct that was reasonably suspected to be flight from the vicinity of the crime. *Id.* at 540.

In contrast with the facts in *Davis*, Deputy Stroop did not observe Turay immediately after the suspects fled from the crime scene. And Deputy Stroop was not provided any information about the suspects' direction of flight; thus, he did not know which streets the robbery suspects fled toward. By the time Deputy Stroop observed Turay at least 30 minutes after the robbery,[23] "the suspects could have traveled on foot within a two[-]mile radius of the

_____

[23] Although the circuit court found that the officer seized Turay "within thirty minutes of the crime," the record shows that Turay was seized 41 minutes after the robbery. According to Sergeant Lemons's uncontradicted testimony, the seizure occurred at 11:36 p.m. and the robbery occurred at 10:55 p.m. R. 357. Lemons provided this testimony when asked, "Was it about 30 minutes earlier?" R. 357. After giving testimony showing that Turay was seized 41 minutes after the robbery, Lemons added, "so . . . yes, ma'am, about a half an hour." R. 357 (alteration in

- 23 -

crime scene, a substantial geographic area comprising 12.57 square miles." *See Commonwealth v. Warren*, 58 N.E.3d 333, 340 (Mass. 2016). Therefore, unlike the officer in *Davis*, who had reason to believe that the suspect would be on Pinewood Drive where he observed the defendant's car hurriedly moving, Deputy Stroop had no reason to suspect that the robbery suspects would be at the location where he observed Turay and Carr.

Also, unlike the officer's observation of the defendant's conduct in *Davis*, Deputy Stroop did not observe Turay engaged in any behavior that can reasonably be characterized as "flight" from the vicinity of the crime. Deputy Stroop observed Turay merely walking—not rushing— six to ten blocks from the scene of the robbery. And there is no evidence that Turay was walking away from rather than toward the scene of the robbery. Thus, the information known by Deputy Stroop did not support an inference that Turay was in flight from the vicinity of the crime.

In *Davis*, this Court explicitly found that the officer had reasonable, articulable suspicion that the seized driver was the suspect who fled from the scene of the fight based on (i) the information from police dispatch that a fight was in progress in the Pinewood subdivision, (ii) the information from another officer on scene that the suspect was running toward Pinewood Drive, and (iii) the officer's "observation of the conduct of the driver of the motor vehicle" on Pinewood Drive—in the same subdivision where the fight occurred—rapidly backing out of a driveway. *Davis*, 35 Va. App. at 540. Contrary to the majority's interpretation, the time of day and number of people "out and about" were not factors in this Court's reasonable suspicion

original). Turay clarified this evidence during oral argument before this Court. Given the undisputed evidence demonstrably showing that Turay was seized 41 minutes after the robbery, it is unreasonable to treat the 30-minute approximation as definitive, even if Turay's briefs failed to clarify this evidence. Although this Court may treat a party's statements of fact as concessions and *may* accept concessions of fact in a party's brief, this Court is not required to accept concessions of fact that are demonstrably contrary to the evidence. *See Mintbrook Devs., LLC v. Groundscapes, LLC*, 76 Va. App. 279, 293 (2022) (opining that this Court "*may* accept concessions of fact" (emphasis added) (quoting *Williams v. Commonwealth*, 71 Va. App. 462, 488 n.9 (2020))).

determination in *Davis*. In contrast with the majority's opinion here, this Court's analysis in *Davis* did not mention or rely on unsupported generalizations about the number of individuals who would be "out and about" "in the early morning hours" in a residential neighborhood.

The majority's reasonable suspicion analysis relies on the circuit court's factual finding that "there were no other people out in the neighborhood" when Deputy Stroop seized Turay. But the circuit court's finding is not a reasonable inference from the only evidence on that issue—Deputy Stroop's testimony that there were *not a lot of people* out on the street when he seized Turay and Carr "just . . . west/north of where CookOut and McDonald's and stuff is on [Route] 250." R. 401. "Not a lot" does not mean none. Nor does it mean few. "Not a lot" means more than several. *See Several*, *Black's Law Dictionary* (9th ed. 2009) ("several" means "more than one or two but not a lot"). The evidence establishes only that Deputy Stroop did not see many people out on the street, not that Turay and Carr were the only people he saw. Contrary to the majority's conclusion, the circuit court could not reasonably infer from the evidence—including "the late hour, the residential nature of the neighborhood, and the fact that it was cold"—that "there were no other people out in the neighborhood" or that Deputy Stroop "saw no one else at all." Although this Court defers to the circuit court's factual findings, we properly reject unreasonable inferences that are not supported by the evidence. *See Jefferson v. Commonwealth*, 27 Va. App. 1, 17 n.3 (1998) (reversing denial of suppression motion and finding trial court's factual finding "clearly erroneous" because it was "not supported by any evidence in the record"); *see also Potts v. Commonwealth*, 12 Va. App. 1093, 1099 (1991) (reversing conviction upon finding that "[t]he inferences the trial court made were unreasonable" because they were unsupported by the evidence). However, as explained below, the deputy's seizure of Turay six to ten blocks from the crime scene was unconstitutional even if the deputy saw no other people out on the street when he encountered Turay and Carr.

- 25 -

The majority also cites *United States v. Moore*, 817 F.2d 1105 (4th Cir. 1987), as supporting authority, but *Moore* too is distinguishable. Moore was "the only person in the vicinity" of a reported burglary when an officer seized him "only two or three minutes" after the building's silent burglar alarm was triggered. *Id.* at 1107. The officer seized Moore upon observing him "close to one of the entrances of the building" and "moving away from the scene of the crime." *Id.* The court held that "[t]hese circumstances in combination support a reasonable suspicion that [Moore] was involved in the break-in." *Id.* In contrast with the officer's pre-seizure observations of Moore, Deputy Stroop did not observe Turay in the immediate vicinity of the crime scene immediately after the crime. Thus, the close temporal and geographical connection to the crime that grounded the officer's reasonable suspicion in *Moore* did not exist here.

C.  Unconstitutional Seizure under Totality of Facts and Circumstances

Even if Turay matched the BOLO's description of the robbery suspects, the totality of the facts and circumstances known to Deputy Stroop at the time of the seizure does not give rise to reasonable suspicion that Turay was involved in the robbery. The relevant facts and circumstances include the following: When Deputy Stroop learned that the perpetrators fled the robbery scene on foot, he had no information about their path of flight. As Deputy Stroop was driving around, he heard the BOLO for "three Black males who were all armed," "wearing black" or "three Black males who were all armed," "wearing black sweatshirts." Around 11:30 p.m., about 30 minutes after the robbery, he saw Turay and Carr, two Black males, walking on the road in a residential neighborhood off Route 250 near two fast-food restaurants. There is no evidence that Turay and Carr were walking away from, rather than toward, the scene of the robbery. Turay was wearing black pants and a long-sleeved black top with distinctive red stripes on the sleeves, and Carr was not wearing any black clothing. Neither Turay nor Carr

- 26 -

appeared to be armed, and both proved to be unarmed.  When Deputy Stroop encountered Turay and Carr, they were six to ten blocks away from the scene of the robbery.  Deputy Stroop did not observe any suspicious or evasive conduct by Turay or Carr.  Deputy Stroop did not see a lot of other people out in the neighborhood that night.

Based on the totality of the facts and circumstances, there was no reasonable, articulable suspicion that Turay was involved in the robbery.  Even if Turay matched the BOLO's vague description—which the majority agrees is insufficient to give rise to reasonable suspicion—this circumstance was not combined with a sufficiently close temporal and geographical connection to the robbery to give rise to reasonable suspicion that Turay was one of the robbers.  Although Deputy Stroop was told that the robbers fled on foot, he had no information about the direction of their flight.  The evidence shows that Deputy Stroop "just rode around in the area"—with which he was unfamiliar—when he happened upon Turay and Carr about 30 minutes—specifically, 41 minutes—after the robbery.  In 30 minutes, the robbery suspects could have traveled on foot within a 2-mile radius of the crime scene, an area over 12 and a half square miles.  *See Warren*, 58 N.E.3d at 340.  Because Deputy Stroop did not know the direction of the suspects' flight, he had no reason to suspect that the robbery suspects would be at or near the particular location where he observed Turay and Carr.  Thus, "[t]he location and timing of the stop were no more than random occurrences and not probative of individualized suspicion where the direction of the perpetrator's path of flight was mere conjecture."  *Id.* at 340[24]; *see also McCain v. Commonwealth*, 275 Va. 546,

---

[24] Contrary to the majority's contention, the holding in *Warren*, 58 N.E.3d at 340 ("The location and timing of the stop were no more than random occurrences and not probative of individualized suspicion where the direction of the perpetrator's path of flight was mere conjecture."), was not limited by *Commonwealth v. Robinson-Van Rader*, 208 N.E.3d 693 (Mass. 2023).  Rather, *Robinson-Van Rader* reaffirmed this holding from *Warren*.  *See Robinson-Van Rader*, 208 N.E.3d at 703.

Moreover, the facts here are distinguishable from the facts that gave police reasonable suspicion justifying the seizure of the defendants in *Robinson-Van Rader*.  There, in addition to

552-53 (2008) (holding that a defendant's mere presence in an area known for criminal activity is insufficient for particularized reasonable suspicion). Since Deputy Stroop seized Turay without reasonable, articulable suspicion that he was one of the robbers, Turay's Fourth Amendment rights were violated and the evidence obtained pursuant to the unconstitutional seizure should have been suppressed.

Consideration of the appellate court's analysis in *M.M. v. State*, 80 So. 3d at 1127 ("find[ing] that the BOLO lacked sufficient specificity to provide the sergeant with reasonable suspicion justifying the stop of appellant"), helps elucidate that the seizure of Turay violated the Fourth Amendment. There, the officer heard a BOLO for "two white males [who] had just robbed the victim at gunpoint and fled the area on foot." *Id.* at 1126. The officer seized the white male defendant upon observing him around midnight walking away from the crime scene with another man, less than three minutes after the reported robbery and three blocks from the crime scene. *Id.* Additionally, the appellant and his walking companion "were not the only people 'in the vicinity of the sighting' that night." *Id.* at 1127 (quoting *Jean v. State*, 987 So. 2d 196, 198 (Fla. Dist. Ct. App. 2008)). The appellate court found that

> [t]he BOLO inform[ing] the officers to look for two white males fleeing the scene on foot . . . lacked any other descriptive information as to the men's height, weight, age, or clothing, and did not indicate a speed or direction of travel. Further, the sergeant did not observe appellant engaging in any suspicious conduct.

---

matching the generic description of two Black males wearing black hoodies, the defendants (i) "were exhibiting nervous behavior[,] . . . 'repeatedly look[ing] back "over their shoulders"'" toward the crime scene, *id.* at 701 (quoting the trial court's finding and trial testimony), (ii) "were moving in the direction of flight from the [crime] scene," *id.* at 702, and (iii) "were observed there only a few minutes after [the reported crime]," *id.* In contrast, neither Turay nor Carr exhibited any nervous or suspicious behavior, they were not known to be moving in the direction of flight from the crime scene, and they were not observed a *few* minutes after the reported crime.

- 28 -

*Id.* Considering the totality of the facts and circumstances, the court in *M.M. v. State* concluded that the seizure of the appellant lacked reasonable, articulable suspicion. *Id.* Accordingly, the court held that the evidence obtained pursuant to the unconstitutional seizure should have been suppressed. *Id.*

In *M.M. v. State*, the seizure of the defendant violated the Fourth Amendment despite the facts that he and his walking companion matched the BOLO description of "two white males" "on foot" and were found walking away from the crime scene three blocks away less than three minutes after the reported robbery. Similarly, the seizure of Turay violated the Fourth Amendment even if he and Carr matched the BOLO description of "Black males" and were seen walking 6 to 10 blocks from the crime scene about 30 minutes after the robbery. Like the BOLO in *M.M. v. State*, the BOLO here was not sufficiently particularized to serve as the basis for reasonable, articulable suspicion of criminal activity. If (i) Turay and Carr had been observed walking away from the crime scene in the immediate vicinity of the crime scene immediately after the robbery and (ii) no other people had been observed immediately after the robbery in the immediate vicinity of the crime, then the totality of the facts and circumstances in such a hypothetical case might support a finding that reasonable, articulable suspicion justified the seizure of Turay. But Deputy Stroop first observed Turay walking six to ten blocks from the crime scene—not in the immediate vicinity of the crime. And there is no evidence about the direction of the suspects' flight nor any evidence that Turay was observed walking away from rather than toward the crime scene. Thus, the evidence known to Deputy Stroop at the time of the seizure not only fails to support a reasonable suspicion that Turay was in flight from the crime scene; the evidence fails to support a reasonable suspicion that Turay was ever in the immediate vicinity of the crime scene. Therefore, the totality of the facts and circumstances known at the time of the seizure does not give rise to reasonable, articulable suspicion that Turay participated in the robbery even if no other people were observed out on the street when the deputy first observed Turay.

CONCLUSION

For the foregoing reasons, I conclude that Turay was subjected to an unconstitutional seizure without reasonable, articulable suspicion that he was involved in any criminal activity. Accordingly, I would reverse the circuit court's judgment denying Turay's motion to suppress, vacate Turay's convictions, and remand to the circuit court for further proceedings consistent with this dissenting opinion, allowing Turay to withdraw his guilty pleas pursuant to Code § 19.2-254.[25]

---

[25] I would grant Turay the same relief that this Court granted his co-defendant, Carr, in *Carr v. Commonwealth*, No. 1136-21-3, 2022 WL 10219762 (Va. Ct. App. Oct. 18, 2022), *petition for appeal refused*, *Commonwealth v. Carr*, No. 220750 (Va. Feb. 22, 2023).

Callins, J., dissenting.

For a *Terry v. Ohio*, 392 U.S. 1 (1968), stop to be lawful, the circumstances that gave rise to the stop "must raise a suspicion that the particular individual being stopped is engaged in wrongdoing." *Wells v. Commonwealth*, 6 Va. App. 541, 551 (1988) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). I agree with my fellow dissenting colleague that two Black men merely walking down the street on a cold night does not give rise to that suspicion. I also agree that the majority today, and despite its insistence otherwise, has elevated a generalized description of race and gender to predominant consideration in a reasonable suspicion analysis. However, I write separately because I believe my fellow dissenting colleague misses the mark in focusing so fixedly on the circuit court's factual findings so as to drown out the more prevalent issue: that, here, the proper application of Fourth Amendment analysis necessitates reversal.

The majority would find that Deputy Stroop's stop was justified because it was late on a cold night, there were no other people walking around, the stop occurred in proximity to the crime scene, and the stopped individuals partially matched the BOLO description. I disagree.

*1. There was not enough particularized information available to the detaining officer to give rise to reasonable suspicion of criminal activity.*

In determining whether a police officer had the "minimal level of objective justification" to justify a *Terry* stop, we consider the totality of the circumstances. *Bland v. Commonwealth*, 66 Va. App. 405, 413 (2016) (quoting *Beasley v. Commonwealth*, 60 Va. App. 381, 395 (2012)). Of primary importance here are the character of the neighborhood, including whether the deputy was aware that the seized individuals matched the racial profile of the area, the time of the stop in relation to the commission of the crime, the proximity between the stop and the crime scene, suspicious behavior from the seized individuals, and whether the seized individuals matched a suspect description. Even taking the circuit court's findings on their face, those facts and circumstances fail to furnish a reasonable suspicion of criminal activity.

- 31 -

First, "[t]he character of the location and the time at which a person is observed are relevant factors, but they do not supply a particularized and objective basis for suspecting criminal activity on the part of the particular person stopped." *McCain v. Commonwealth*, 275 Va. 546, 552 (2008). Here, the record does not establish the racial makeup of the neighborhood. The character of the location is not even part of the record. Without that information, the circumstances surrounding the stop—like the fact that there were no other people around and that Turay and his companion were on foot—have limited probative value.

Second, the record shows that Deputy Stroop stopped the men "a distance less than 10 blocks and likely less than six blocks," approximately 30 minutes after the crime was committed. It is true that proximity is a relevant factor in justifying a *Terry* stop. But the facts here do not supply such a justification and fail to provide the level of specificity necessary for proximity to carry great weight. At the time of the stop, Deputy Stroop did not know in what direction the suspects had traveled. What is more, with 30 minutes having passed between the robbery and the stop, the search area was necessarily large. And Deputy Stroop was without any information that would have supplied a reason to believe the suspects would be found in a particular location. Third, there is no evidence in the record showing that Turay and his companion were behaving suspiciously. *Cf. Wells*, 6 Va. App. at 554 (finding that the suspect's erratic driving and suspicious behavior were facts supporting reasonable suspicion). Instead, Turay and his companion were engaged in an ordinary, benign activity: walking down the street. Their movements were not hurried. *Cf. Davis v. Commonwealth*, 35 Va. App. 533, 540 (2001) (finding reasonable suspicion where an officer, after having arrived at the road toward which the suspect was running, "saw a motor vehicle being rapidly backed out of a driveway"). Nor were the pair moving furtively or evasively. *Cf. Whitaker v. Commonwealth*, 279 Va. 268, 276 (2010) (considering, in its reasonable suspicion analysis, the suspect's "unusual behavior in abandoning

- 32 -

his bicycle," "seemingly frantic determination to elude the police," and "holding onto his right jacket pocket as he ran"); *Brown v. Commonwealth*, 33 Va. App. 296, 308 (2000) (considering, in its totality of the circumstances analysis, that when passed by an officer on a bicycle, the suspect "turn[ed] away and 'le[ft] very fast'").

Finally, the BOLO was vague. The BOLO was for "three Black males wearing black." Based on the BOLO, Deputy Stroop was looking for three Black men wearing black clothing.[26] Turay only partially matched this vague description. Upon seeing Turay and his companion walking down the street, Deputy Stroop immediately stopped them at gunpoint. He did so even though he saw only two Black men walking down the street—not three—and only one wearing black. On its face, this stop simply cannot meet the requirements of the Fourth Amendment. The BOLO was too generalized and unclear to support a reasonable suspicion of wrongdoing.

My fellow dissenting colleague notes the circuit court's erroneous findings of fact. I agree that some of the factual findings are not supported by the evidence. Yet, even accepting all the circuit court's findings does not support that Deputy Stroop had "reasonable, articulable suspicion" to stop Turay. *Long v. Commonwealth*, 72 Va. App. 700, 712 (2021). To the contrary, in considering the character of the neighborhood, the proximity from the crime scene and time of the stop, the lack of suspicious behavior by Turay, and the vague BOLO description, Turay's Fourth Amendment rights were violated.

---

[26] The BOLO specifically described the suspects as wearing "black sweatshirts," yet the circuit court more broadly found that the BOLO was for suspects "wearing black." My fellow dissenting colleague addresses this point extensively. Yet whether it was "wearing black sweatshirts" or "wearing black," neither description supplies particularity sufficient to save it from a vagueness so broad as to render the description meaningless.

*2. Sister jurisdictions, under similar attending circumstances, have found that race and gender are not enough to provide particularized suspicion of criminal activity.*

In sister jurisdictions, courts have likewise found that race and gender are not enough to provide particularized suspicion of criminal activity by an individual who merely matches the race and gender descriptors. My fellow dissenting colleague provides a helpful survey of this jurisprudential landscape.

Of particular note, the Supreme Court of Massachusetts wrestled with the same issue in *Commonwealth v. Warren*, 58 N.E.3d 333 (Mass. 2016). There, Boston police officers were searching for three Black men, one wearing a "red hoodie," another wearing a "black hoodie," and a third in "dark clothing." *Id.* at 336. It was cold, late at night, and there were few pedestrians in the neighborhood surrounding the crime scene. *Id.* A police officer saw two Black men walking in the area, one of whom was wearing a "dark-colored hoodie." *Id.* When the men made eye contact with the police officer, they jogged away. *Id.* at 337. After a short chase, a police officer caught the men and conducted an investigatory *Terry* stop. *Id.*

The Supreme Court of Massachusetts held that the stop was unconstitutional because the police officers lacked reasonable suspicion. *Id.* at 343. The court noted that "the police did not know whom they were looking for that evening, except that the suspects were three black males: two black males wearing the ubiquitous and nondescriptive 'dark clothing,' and one black male wearing a 'red hoodie.'" *Id.* at 339. The court found that the stop was not particularized because the police officers "[l]ack[ed] any information about facial features, hairstyles, skin tone, height, weight, or other physical characteristics." *Id.* Thus, the police officers were incapable of distinguishing the suspects from the crime scene from any other Black male wearing dark clothing or a red hoodie. *Id.* Although the court agreed "that proximity of the stop to the time and location of the crime is a relevant factor in the reasonable suspicion analysis," it cautioned that these factors are "no more than random occurrences" when police lack information about the

direction in which perpetrators fled. *Id.* at 339-40. The court also noted that the elapsed time between the crime and the stop—30 minutes—did not clearly match the distance between the stop and the crime scene, which was one mile. *Id.* at 340 ("the suspects could have traveled on foot within a two[-]mile radius of the crime scene, a substantial geographic area comprising 12.57 square miles").

This case is remarkably like *Warren*.[27] Like the Boston police department, Deputy Stroop lacked any identifiable information about the suspects beyond their race, gender, and a vague monochromatic description of their clothing. Deputy Stroop and the Boston officers stopped two suspects, not three. And, in each case, only one of the stopped individuals was wearing matching or similar clothing to the suspect's description. In both cases, the temperature, time of night, and proximity to the crime scene are relevant facts. However, in *Warren*, the court held that the officers lacked sufficient information to distinguish their suspects from any other group of Black men wearing black clothing that evening. We are compelled to reach the same conclusion. The information available to Deputy Stroop was not sufficiently particularized to stop Turay.

---

[27] The majority, while agreeing that *Warren* has "some similarities to this case," uses a recent decision of the same court, *Commonwealth v. Robinson-Van Rader*, 208 N.E.3d 693 (Mass. 2023), to dull *Warren*'s salience. My colleagues contend that *Robinson-Van Rader* "distinguished and limited *Warren*," with the court finding that, notwithstanding "a generalized BOLO that described two Black men on bicycles wearing hoodies," the "officers had reasonable suspicion to detain two Black men on foot a mile from the reported crime."

While the matter of whether *Robinson-Van Rader* limited *Warren* could be debated ad infinitum, *Robinson-Van Rader* contrasts well with this case. In *Robinson-Van Rader*, the detained individuals (i) "were exhibiting nervous behavior," of a kind sufficient for it to be considered in the court's reasonable suspicion calculus, (ii) "were stopped seven minutes after the initial report," and while the stop took place one mile from the crime scene, "[t]he location of the stop was not a 'random occurrence,'" as "reports by witnesses and police officers followed the path of the suspects," and (iii) were suspected of being involved in a shooting, which the trial court found was a crime of sufficient "gravity" as to "support[] the officers' stop." 208 N.E.3d at 701, 703-04. In this case, neither (i) nor (ii) are present; Turay was not exhibiting nervous behavior, and there were no reports tracking the path of Turay and his companion following the crime. And although the crime here was serious, it did not involve a shooting.

- 35 -

Like the courts in other jurisdictions, we should recognize that the Constitution does not allow investigatory stops based on generalized suspect descriptions alone. *See United States v. Brown*, 448 F.3d 239, 252 (3rd Cir. 2006) ("[A]n excessively general description . . . does not constitute reasonable suspicion under the 'narrowly drawn authority' of *Terry*." (quoting *Terry*, 392 U.S. at 27)). "In the absence of other circumstances that provide sufficient particularity, a generalized description applicable to large numbers of people contradicts the Fourth Amendment's jurisprudence demanding specificity and will not suffice to justify the seizure of any individual." *Armstrong v. United States*, 164 A.3d 102, 108 (D.C. 2017) (citations omitted) (holding that the lookout description was insufficiently particularized where the description consisted of "a white car, possibly a Mercury Sable, with tinted windows and two black males"). *See Terry*, 392 U.S. at 21 n.18 ("This demand for specificity in the information upon which police action is predicated is the central teaching of [the United States Supreme] Court's Fourth Amendment jurisprudence."). We are bound by the Supreme Court's decisions which compel us to require *specificity* when a police officer enacts a *Terry* stop. *See id.*

Accordingly, I must conclude that two men walking down the street cannot be detained simply because a few Black male suspects committed a crime in the vicinity. A contrary holding would be akin to holding that, when a Black man commits a crime and flees, any Black man in the vicinity is inherently a suspect. A contrary holding subjects to scrutiny, suspicion, and, potentially, harassment, every perceived Black male, adult or minor, who "matches the description" where such description consists only of race and gender. Such leaves little recourse for, and so renders invisible, the harms suffered by those for whom no criminal charges can be brought. The same would be true for men of all races, women, and anyone matching a generalized race and gender description. Under the Fourth Amendment, that cannot be the case.

Racially motivated stops are a pervasive problem in our society, and we must examine whether a stop could be justified by any information available to the officer before determining that the stop was illegal.  *See Bland*, 66 Va. App. at 413-14.  But I cannot say, given the totality of the circumstances, that *this* stop justified as particularized.  The Fourth Amendment dictates that people have a right to be free from unreasonable searches and seizures, *see* U.S. Const. amend. IV.  The scope of the exceptions to that principle cannot be so broad as to vitiate well-established Fourth Amendment protections.  The Fourth Amendment, and the principles of justice and freedom that underlie it, dictate the conclusion that this stop was unconstitutional.

CONCLUSION

For the above reasons, I would hold that Deputy Stroop did not have a reasonable suspicion that Turay was engaged in criminal activity.  Thus, Turay was seized in violation of the Fourth Amendment.  Like my fellow dissenting colleague, I would reverse the judgment of the circuit court and remand the case for further proceedings, allowing Turay to withdraw his guilty pleas pursuant to Code § 19.2-254.

# *VIRGINIA:*

*In the Court of Appeals of Virginia on*   **Tuesday**   *the*  **18th**  *day of*  **April, 2023**.

Arun Rashid Turay,                                                                                    Appellant,

 against        Record No. 0868-21-3
                     Circuit Court Nos. CR20000396-00 through CR20000398-00 and
                     CR20000400-00

Commonwealth of Virginia,                                                                      Appellee.

Upon a Petition for Rehearing En Banc

Before the Full Court

On April 3, 2023 came the appellee, by the Attorney General of Virginia, and filed a petition requesting that the Court set aside the judgment rendered herein on March 21, 2023, and grant a rehearing *en banc* on the issue(s) raised in the petition.

On consideration whereof and pursuant to Rule 5A:35 of the Rules of the Supreme Court of Virginia, the petition for rehearing *en banc* is granted and the appeal of those issues is reinstated on the docket of this Court.  The mandate previously entered herein is stayed pending the decision of the Court *en banc*.

The parties shall file briefs in compliance with the schedule set forth in Rule 5A:35(b).  The appellant shall attach as an addendum to the opening brief upon rehearing *en banc* a copy of the opinion previously rendered by the Court in this matter.  An electronic version of each brief shall be filed with the Court and served on opposing counsel.[1]

A Copy,
                         Teste:

                                        A. John Vollino, Clerk

                                        *original order signed by a deputy clerk of the*
                         By:        *Court of Appeals of Virginia at the direction*
                                        *of the Court*
                                                      Deputy Clerk

---

[1] The guidelines for filing electronic briefs and appendices can be found at www.courts.state.va.us/online/vaces/resources/guidelines.pdf.

Present:   Judges Chaney, Callins and Senior Judge Petty
Argued by videoconference


ARUN RASHID TURAY

                                                     MEMORANDUM OPINION* BY
v.        Record No. 0868-21-3                        JUDGE VERNIDA R. CHANEY
                                                          MARCH 21, 2023
COMMONWEALTH OF VIRGINIA


UPON A REHEARING


FROM THE CIRCUIT COURT OF THE CITY OF WAYNESBORO
Paul A. Dryer, Judge

    Jessica N. Sherman-Stoltz (Sherman-Stoltz Law Group, PLLC, on
    briefs), for appellant.

    Liam A. Curry, Assistant Attorney General (Jason S. Miyares,
    Attorney General, on briefs), for appellee.


      Arun Rashid Turay (Turay) entered conditional guilty pleas in the Circuit Court for the City

of Waynesboro (circuit court) and appealed the circuit court's denial of his motion to suppress

evidence.[1]  Turay contends on appeal that the circuit court erred in finding that the police had

reasonable, articulable suspicion to detain him and, therefore, erred in denying his motion to

---

      * This opinion is not designated for publication.  *See* Code § 17.1-413.

      [1] Pursuant to Code § 19.2-254, Turay's entry of conditional guilty pleas reserved his right to
appellate review of the circuit court's adverse determination of his suppression motion.  Based on
his conditional guilty pleas, Turay was convicted of armed burglary in violation of Code § 18.2-90,
robbery in violation of Code § 18.2-58, use of a firearm in commission of robbery in violation of
Code § 18.2-53.1, and possession or transportation of a firearm after having been convicted of a
violent felony in violation of Code § 18.2-308.2.

suppress the fruits of his unconstitutional seizure.[2]  A divided panel of this Court issued a decision on October 18, 2022, affirming the circuit court's judgment denying Turay's suppression motion.  Turay timely petitioned the panel to reconsider its decision.  The panel granted Turay's petition for rehearing, withdrew the panel's original opinion, and vacated the mandate by order dated November 22, 2022.  After rehearing, this Court agrees with Turay and reverses the circuit court's judgment denying his motion to suppress.

## BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party" in the circuit court.  *McGowan v. Commonwealth*, 72 Va. App. 513, 516 (2020) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)).  This Court "regard[s] as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence."  *Id.* (citing *Gerald*, 295 Va. at 473).

On February 17, 2020, late in the evening, Deputy Sheriff Stroop of Augusta County responded to a radio call regarding a robbery in Waynesboro.  When Deputy Stroop drove by the crime scene in Waynesboro, an officer on the roadway told him "there [were] people inside the house that weren't supposed to be there, a firearm was taken, and then they fled on foot."  Although unfamiliar with the area, Deputy Stroop decided to drive around to look for the suspects.

While Deputy Stroop was driving, he heard Sergeant Lemons announce on the radio a "be on the lookout" (BOLO) for "three Black males, all armed" and "wearing black sweatshirts." Around 11:30 p.m., about thirty minutes after the robbery, Deputy Stroop stopped and detained two

---

[2] Turay's co-defendant, Justice Ahmad Carr, filed a separate appeal to this Court challenging the denial of his motion to suppress, which was heard in the circuit court in a joint evidentiary hearing with Turay's suppression motion.  *See Carr v. Commonwealth*, No. 1136-21-3 (Va. Ct. App. Oct. 18, 2022) (vacating convictions where defendant was unlawfully seized without reasonable, articulable suspicion of criminal activity and the trial court erred in failing to suppress evidence obtained pursuant to the unconstitutional seizure).

Black men who "were walking down the road." The two men seized by the deputy were Turay and his co-defendant, Justice Ahmad Carr (Carr). The location of the seizure was approximately six to ten blocks from the scene of the robbery, although Deputy Stroop testified that he did not recall how far he was from the crime scene when he stopped Turay and Carr. Deputy Stroop testified that at the time of the seizure, there were not many people out on the street where Turay and Carr were walking. Deputy Stroop also testified that Turay and Carr were not doing anything but walking down the road in a residential neighborhood.

Deputy Stroop testified that he seized Turay and Carr after he concluded "[t]hey matched the description of what was given out" over the radio. According to Sergeant Lemons's police report and testimony, neither Turay's nor Carr's clothing matched the suspects' clothing description that Sergeant Lemons gave in the BOLO.[3] Sergeant Lemons testified that Turay was wearing a black hooded jacket with a red stripe down the arm. Officer Mawyer, a patrol officer who responded to the BOLO, also testified that Turay "was wearing a black jacket with a distinct red stripe . . . down the sleeves" and Carr was wearing gray pants and a white hoodie. The police

---

[3] Sergeant Lemons's testimony:

> Q: And then you arrived, and you immediately saw that they weren't wearing what was described, or what you knew personally from the — from the cell phone footage; right?
>
> A: Correct. . . . *[T]he clothing didn't match; that's correct.*
>
>   . . . .
>
> Q: Do you recall, in your report, that . . . You indicated in your report that at the time of arrival that the first thing you noticed was that neither of the males' clothing description matched what you had said over the radio?
>
> A: I do recall that; yes, ma'am.

(Emphasis added).

- 3 -

bodycam video shows Carr wearing light gray pants, a long-sleeved white top with a multi-colored print and lettering on the front, a white or light-colored cap with a dark brim, turned backward, and a backpack with a floral design. The police bodycam video shows Turay wearing black pants and a long-sleeved black top with a wide red stripe down each sleeve and a wider blue stripe on each side of the garment.

Deputy Stroop held Turay and Carr at gunpoint and directed them to place their hands on the hood of his police car. Moments later, after Deputy Stroop notified Waynesboro police, Officers Cacciapaglia and Mawyer from Waynesboro arrived separately at Deputy Stroop's location to determine whether he had detained the right people.

Upon Officer Mawyer's arrival at the detention site, Sergeant Lemons provided a more detailed description of the suspects' clothing, including information obtained after the BOLO. After hearing this additional information, the Waynesboro patrol officers handcuffed and searched Turay and Carr. Neither Turay nor Carr possessed any weapons. But Carr possessed credit cards belonging to one of the victims, and Turay had a bookbag that contained a victim's keys in addition to bloody clothes and shoes that looked the same as items seen on the video of the robbery. A DNA comparison showed that the blood on the clothes matched one of the victims.

Turay filed a suppression motion in the circuit court alleging that his detention by Deputy Stroop was an unconstitutional seizure because it was not supported by reasonable, articulable suspicion that Turay was involved in the robbery. Carr also filed a suppression motion alleging that he was unconstitutionally stopped and detained without reasonable, articulable suspicion. After a joint hearing on both defendants' suppression motions, the circuit court denied both motions for the reasons stated in its letter opinion dated March 24, 2021 (March 2021 letter opinion).

In the March 2021 letter opinion, the circuit court made the following factual findings:

- The first BOLO description radioed by Sergeant Lemons described the suspects as "three Black males wearing black."

- 4 -

- Although Sergeant Lemons radioed more detailed descriptions of the suspects' clothing after the initial BOLO, "Deputy Stroop would have only heard the first description prior to detaining the Defendants."

- When Sergeant Lemons arrived at the location where Turay and Carr were detained, "he noticed that their clothing did not match precisely the descriptions that he previously gave over his police radio."

- "Carr's clothing was not black," but "Turay's clothing was black, matching the description heard by Deputy Stroop."

- "Neither [Carr nor Turay] was wearing black sweatpants with a red stripe."

- "[T]he Defendants at the time [Deputy] Stroop encountered them, matched the description in sex, race, and some of the clothing."

- "[T]here were no other people out in the neighborhood during this time" when Deputy Stroop observed Turay and Carr walking down the street late in the evening.

- "[T]he Defendants were the only two people Deputy Stroop encountered walking in the residential neighborhood, at 11:30 p.m., a relative short distance from the crime scene within thirty minutes of the crime."

The circuit court also found that, taken together, the factors of proximity, time, physical description, gender, and racial description "gave Deputy Stroop, an objective, reasonable suspicion that the Defendants may have been involved in the crime that occurred a few blocks away and a few minutes before his encounter with them." Thus, the circuit court found that Deputy Stroop had reasonable, articulable suspicion to stop and detain Turay and Carr. Based on these findings, the circuit court held that "the stop and detention of the Defendants by Deputy Stroop was not in violation of the Fourth Amendment." Accordingly, the circuit court denied both defendants' suppression motions. This appeal followed.

ANALYSIS

A. Standard of Review

On appeal of the denial of a motion to suppress evidence, this Court "determine[s] whether the accused has met his burden to show that the trial court's ruling, when the evidence is viewed in the light most favorable to the Commonwealth, was reversible error." *Merid v.*

*Commonwealth*, 72 Va. App. 104, 108 (2020) (quoting *Cantrell v. Commonwealth*, 65 Va. App. 53, 56 (2015)), *aff'd*, 300 Va. 77 (2021), *cert. denied sub nom. Merid v. Virginia*, 142 S. Ct. 1137 (2022). Turay's "claim that [he] was seized in violation of the Fourth Amendment presents a mixed question of law and fact . . . ." *Id.* at 108-09 (quoting *King v. Commonwealth*, 49 Va. App. 717, 721 (2007)). This Court is "bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." *Id.* at 109 (quoting *Cantrell*, 65 Va. App. at 56). "However, we consider *de novo* whether those facts implicate the Fourth Amendment and, if so, whether the officers unlawfully infringed upon an area protected by the Fourth Amendment." *Id.* (quoting *Cantrell*, 65 Va. App. at 56); *see also Moreno v. Commonwealth*, 73 Va. App. 267, 274 (2021) ("[We] review[ ] *de novo* the overarching question of whether a search or seizure violated the Fourth Amendment." (quoting *Williams v. Commonwealth*, 71 Va. App. 462, 475 (2020))).

### B. Motion to Suppress the Fruits of the Unconstitutional Seizure

Turay argues on appeal that the circuit court erred in denying his motion to suppress because Deputy Stroop unreasonably seized him without a warrant and without reasonable, articulable suspicion that he was engaged in criminal activity. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "If a police officer has reasonable, articulable suspicion that a person is engaging in, or is about to engage in, criminal activity, the officer may detain the suspect to conduct a brief investigation without violating the person's Fourth Amendment protection against unreasonable searches and seizures." *Long v. Commonwealth*, 72 Va. App. 700, 712 (2021) (quoting *McGee v. Commonwealth*, 25 Va. App. 193, 202 (1997) (en banc)). "A reasonable, articulable suspicion is 'a particularized and objective basis for suspecting the person

stopped of criminal activity.'" *Id.* (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). To determine whether a police seizure is reasonable under the Fourth Amendment, this Court considers the totality of the particular circumstances at the time of the seizure. *See Harmon v. Commonwealth*, 15 Va. App. 440, 445 (1992).

We hold that Deputy Stroop's detention of Turay violated his Fourth Amendment right against unreasonable seizures because, at the time of the seizure, there was no particularized, objective basis for suspecting Turay of criminal activity. There is no evidence that Deputy Stroop observed Turay or Carr do anything suspicious or evasive. Deputy Stroop detained Turay and Carr when they were merely walking—not rushing—down the street at night in a residential neighborhood. There is no evidence that they were walking away from, rather than toward, the scene of the robbery. The mere observation of two Black men walking late at night in a residential neighborhood cannot give rise to reasonable, individualized suspicion that they were involved in a robbery that occurred six to ten blocks away thirty minutes earlier. *See McCain v. Commonwealth*, 275 Va. 546, 552 (2008) ("The character of the location and the time at which a person is observed are relevant factors, but they do not supply a particularized and objective basis for suspecting criminal activity on the part of the particular person stopped." (citing *Brown v. Texas*, 443 U.S. 47, 51-52 (1979); *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000))). And the circuit court's finding that "there were no other people out in the neighborhood" when Turay and Carr were walking down the street is not a reasonable inference from the only evidence on that issue—that there were not a lot of people out on the street at that time. Although this Court defers to the circuit court's factual findings, we reject unreasonable inferences that are not supported by the evidence. *See Potts v. Commonwealth*, 12 Va. App. 1093, 1099 (1991).

Deputy Stroop testified that he detained Turay and Carr only because he thought they matched the description of the suspects in the BOLO. Yet the BOLO only included a vague

- 7 -

description of clothing and did not include a description of any suspect's height, weight, build, hair style, facial characteristics, age, or any other distinguishing physical features apart from the general classifications of race (Black) and gender (male).

In fact, the record shows that Turay and Carr did not match the extremely vague BOLO description of three armed Black males wearing black sweatshirts. First, as Sergeant Lemons testified and recorded in his police report, the first thing he noticed when he saw Turay and Carr was that neither Turay's nor Carr's clothing matched the suspects' clothing description in the BOLO.[4] Carr was not wearing black at all, but was wearing a white top and light gray pants. Turay was wearing a black jacket or black sweatshirt with distinctive red stripes down the sleeves and a wider blue stripe on each side. Second, there were only two men, not three. Third, nothing in the record supports an inference that either Turay or Carr appeared to be armed; in fact, neither was armed.

Considering the facts available to Deputy Stroop at the time of the seizure, as we must, Deputy Stroop's observations of Turay did not provide a particularized, objective basis for suspecting Turay's involvement in the robbery or any other criminal activity. *See Terry v. Ohio*,

---

[4] According to the dissent, even if Turay and Carr's clothing did not match the BOLO description of the suspects' clothing, Deputy Stroop reasonably stopped them based on his honest belief that their clothing matched the BOLO description. The dissent concludes that the deputy's honest mistake of fact does not warrant the suppression of evidence. However, as the Supreme Court recognized in *Terry*, "[i]f subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police." *Terry v. Ohio*, 392 U.S. 1, 22 (1968) (quoting *Beck v. Ohio*, 379 U.S. 89, 97 (1964)).

Although the suppression of evidence is not warranted when the justification for a seizure includes an officer's *reasonable* mistake of fact, the record does not support a finding that Deputy Stroop reasonably mistook Turay and his companion, Carr—who was wearing a long-sleeved white top—for two Black males wearing black sweatshirts. *Cf. Heien v. North Carolina*, 574 U.S. 54, 57 (2014) (Under the Fourth Amendment, "a search or seizure may be permissible even though the justification for the action includes a reasonable factual mistake."); *Collins v. Commonwealth*, 297 Va. 207, 218 (2019) (holding that suppression is not a proper remedy for a Fourth Amendment violation where the police acted with an objectively reasonable, good faith belief that the search and seizure were constitutional).

392 U.S. 1, 21-22 (1968) (establishing that the court should consider "the facts available to the officer at the moment of the seizure"). Deputy Stroop expressly testified that he stopped Turay and Carr because he thought they matched the BOLO description. But even if Turay had been wearing a garment that could be accurately described as a "black sweatshirt," as described in the BOLO, wearing such a non-distinctive garment—without more—does not support a finding of particularized reasonable suspicion of criminal activity. "In the absence of other circumstances that provide sufficient particularity, a generalized description applicable to large numbers of people contradicts the Fourth Amendment's jurisprudence demanding specificity and will not suffice to justify the seizure of any individual." *Armstrong v. United States*, 164 A.3d 102, 108 (D.C. 2017) (citations omitted) (holding that the lookout description was insufficiently particularized where the description consisted of "a white car, possibly a Mercury Sable, with tinted windows and two Black males"); s*ee also United States v. Brown*, 448 F.3d 239, 247 (3d Cir. 2006) (holding that the police radio broadcast of a description of two Black male robbery suspects "fail[ed] to satisfy the Fourth Amendment's 'demand for specificity'" (quoting *Terry*, 392 U.S. at 21 n.18)). Here, the BOLO description of three Black males wearing black sweatshirts lacks the particularized specificity necessary to warrant the seizure of any person. *See Terry*, 392 U.S. at 21 n.18 ("This demand for specificity in the information upon which police action is predicated is the central teaching of [the United States Supreme] Court's Fourth Amendment jurisprudence.").

Because there was no particularized, objective basis for suspecting that Turay was engaged in criminal activity, Deputy Stroop's seizure of Turay was without reasonable, articulable suspicion that Turay was involved in the robbery. Therefore, because Turay was seized in violation of his Fourth Amendment right against unreasonable seizures, we conclude that the circuit court erred in denying Turay's motion to suppress the fruits of the officers' Fourth Amendment violation. S*ee*

*Terry*, 392 U.S. at 15 (holding that an unreasonable search or seizure by police "must be condemned by the judiciary and its fruits must be excluded from evidence in criminal trials"); *see also Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

CONCLUSION

The warrantless seizure of Turay violated the Fourth Amendment because, at the time of the seizure, the police lacked particularized reasonable, articulable suspicion that Turay was engaged in criminal activity. Therefore, this Court holds that the circuit court erred in denying Turay's motion to suppress the fruits of the unconstitutional seizure. Accordingly, this Court reverses the circuit court's decision denying the motion to suppress, vacates Turay's convictions, and remands to the circuit court for further proceedings not inconsistent with this opinion, allowing Turay to withdraw his guilty pleas pursuant to Code § 19.2-254.

*Reversed and remanded.*

Petty, S.J., dissenting.

Last October we issued an opinion affirming the trial court's denial of Turay's motion to suppress. *Turay v. Commonwealth*, No. 0868-21-3 (Va. Ct. App. Oct. 18, 2022) (*Turay I*). Despite there being no change to either the facts or the law since that opinion, a majority of the panel granted Turay's petition for rehearing and has now reversed course. I continue to believe that the panel was correct in its initial decision, and I have seen nothing that would change the outcome. Therefore, for the reasons set out in the majority opinion in *Turay I* as well as those reasons I expressed in my dissent to the companion case of *Carr v. Commonwealth*, No. 1136-21-3 (Va. Ct. App. Oct. 18, 2022), I respectfully dissent.